Evan J. Smith
BRODSKY & SMITH
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:     516.741.4977
Facsimile:      516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD BELL,<br><br>                              Plaintiff,<br><br>             vs.<br><br>CATCHMARK TIMBER TRUST, INC., DOUGLAS D. RUBENSTEIN, TIM E. BENTSEN, BRIAN M. DAVIS, JAMES M. DECOSMO, PAUL S. FISHER and MARY E. MCBRIDE,<br><br>                              Defendants. | Case No.:<br><br>**Complaint For:**<br><br>(1)  Breach of Fiduciary Duties<br>(2)  Aiding and Abetting Breach of Fiduciary Duties<br>(3)  Violation of § 14 (a) of the Securities Exchange Act of 1934<br>(4)  Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Richard Bell ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1.      Plaintiff brings this stockholder action against CatchMark Timber Trust, Inc. ("CatchMark" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," and collectively with the Company, the "Defendants"), for breaches of fiduciary duty violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934

(the "Exchange Act") as a result of Defendants' efforts to sell the Company to PotlatchDeltic Corporation ("Parent"), through merger vehicle Horizon Merger Sub 2022, LLC ("Merger Sub" and collectively with Parent, "PotlatchDeltic") as a result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed stock and cash transaction (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in a May 31, 2022, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Agreement, CatchMark public stockholders will receive, in exchange for each share of CatchMark stock, 0.230 shares of PotlatchDeltic Common Stock. As a result, CatchMark will become an indirect wholly-owned subsidiary of PotlatchDeltic.

3.      Thereafter, on July 8, 2022, PotlatchDeltic filed a Registration Statement on Schedule S4 (the "Registration Statement") with the SEC in support of the Proposed Transaction.

4.      The Proposed Transaction is unfair for a number of other reasons.  Significantly, the Registration Statement describes an insufficient process in which the Board rushed through an inadequate "sales process" in which no special committee of independent and disinterested directors was created to run the sales process.

5.      Next, it appears as though the Board has entered into the Proposed Transaction to procure for itself and senior management of the Company significant and immediate benefits with no thought to Plaintiff, as well as the Company's public stockholders.  For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.

6.      In approving the Proposed Transaction, the Individual Defendants have breached

their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell CatchMark without first taking steps to ensure that Plaintiff in his capacity as a public Company stockholder would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or CatchMark without regard for Plaintiff in his capacity as a public Company stockholder. Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Plaintiff in his capacity as a public Company stockholder.

7.     In violation of the Exchange Act and in further breach of their fiduciary duties, on July 8, 2022, Defendants caused to be filed the materially deficient Registration Statement. The Registration Statement is materially deficient and is thus in violation of the Exchange Act. As detailed below, the Definitive Registration Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for both Catchmark and PotlotchDeltic, provided by Catchmark management to the Board's financial advisor Stifel, Nicolaus & Company, Incorporated ("Stifel"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinion created by Stifel and provided to the Company and the Board.

8.     Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff. This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages suffered by Plaintiff resulting from the breaches of fiduciary duties and violations of the federal securities laws by Defendants.

## PARTIES

9.      Plaintiff is a citizen of California and, at all times relevant hereto, has been a CatchMark stockholder.

10.     Defendant CatchMark seeks to deliver consistent and growing per share cash flow from disciplined acquisitions and superior management of prime timberlands located in high demand U.S. mill markets. CatchMark is incorporated in Maryland and has its principal place of business at 5 Concourse Parkway, Suite 2650 Atlanta, Georgia 30328.  Shares of CatchMark common stock are traded on the New York Stock Exchange under the symbol "CTT".

11.     Defendant Douglas D. Rubenstein ("Rubenstein") has been a Director of the Company at all relevant times.

12.     Defendant Tim E. Bentsen ("Bentsen") has been a director of the Company at all relevant times.

13.     Defendant Brian M. Davis ("Davis") has been a director of the Company at all relevant times. Davis also serves as the company's Chief Executive Officer ("CEO") and President.

14.     Defendant James DeCosmo ("DeCosmo") has been a director of the Company at all relevant times.

15.     Defendant Paul Fisher ("Fisher") has been a director of the Company at all relevant times.

16.     Defendant Mary E. McBride ("McBride") has been a director of the Company at all relevant times.

17.     Defendants identified in ¶¶ 11 - 16 are collectively referred to as the "Individual Defendants."

18.     Non-Party PotlatchDeltic is a leading timberland owner and a top 10 manufacturer of lumber in the United States.

19.     Non-Party Merger Sub is a wholly owned subsidiary of PotlatchDeltic created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

21.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company's stock trades on the New York Stock Exchange which is headquartered in this District.

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

23.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with CatchMark and owe the public stockholders of the Company, including Plaintiff, the duties of due care, loyalty, and good faith.

24.     By virtue of their positions as directors and/or officers of CatchMark, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause CatchMark to engage in the practices complained of herein.

25.     Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company public stockholders including Plaintiff.  To diligently comply with these duties, directors of a corporation must:

    a.  act with the requisite diligence and due care that is reasonable under the circumstances;

    b.  act in the best interest of the Company and its public stockholders, including Plaintiff;

    c.  use reasonable means to obtain material information relating to a given action or decision;

    d.  refrain from acts involving conflicts of interest between the fulfillment of their roles in the Company and the fulfillment of any other roles or their personal affairs;

    e.  avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

    f.  disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the Company.

26.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of CatchMark, are obligated to refrain from:

a. participating in any transaction where the directors' or officers' loyalties are divided;

b. participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders including Plaintiff; and/or

c. unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders including Plaintiff.

27. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Plaintiff as a public stockholder of CatchMark, including their duties of loyalty, good faith, and due care.

28. As a result of the Individual Defendants' divided loyalties, Plaintiff will not receive adequate, fair or maximum value for his CatchMark common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### Company Background

29. CatchMark seeks to deliver consistent and growing per share cash flow from disciplined acquisitions and superior management of prime timberlands located in high demand U.S. mill markets. Concentrating on maximizing cash flows throughout business cycles, the company strategically harvests its high-quality timberlands to produce durable revenue growth and takes advantage of proximate mill markets, which provide a reliable outlet for merchantable inventory. Headquartered in Atlanta and focused exclusively on timberland ownership and management, CatchMark began operations in 2007 and owns interests in 1.5 million acres of

timberlands located in Alabama, Florida, Georgia, North Carolina, Oregon, South Carolina and Texas.

30.     The Company's most recent financial performance press release, revealing financial results from the quarter preceding the announcement of the Proposed Transaction, indicated impressive financial success.  For example, in the May 5, 2022 press release announcing its Fiscal Year 2022 Q1 financial results, the Company highlighted achieved $3.2 million of net income, and adjusted EBITDA of $14.8 million, 15% higher than prior year quarter.

31.     Speaking on the positive results, Todd Reitz, CatchMark's Chief Resources Officer, said: "CatchMark continues to benefit from our prime timberlands located in premier U.S. South mill markets. Strong demand for all products and low raw material inventories during the quarter kept pricing tension high and we capitalized on the opportunity, registering significant delivered and stumpage sales pricing increases. Successful negotiations with many of our customers supported delivered price increases and helped offset rising cut and haul costs, allowing us to maintain stumpage margins. Strong macro-demand fundamentals continue to drive mill production needs and pricing for chip-n-saw and pine sawtimber products should remain strong into the second quarter."

32.     The sustained financial success and impressive results are not an anomaly, but rather, are indicative of a trend of continued future potential success by CatchMark.  Clearly, based upon the positive outlook, the Company is likely to have tremendous future success.

33.     Despite this upward trajectory, the Individual Defendants have caused CatchMark to enter into the Proposed Transaction without providing requisite information to CatchMark stockholders such as Plaintiff.

*The Flawed Sales Process*

34.     As detailed in the Registration Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company by any means possible.

35.     The Registration Statement is silent as to whether a committee of the Board composed of disinterested and independent members was created to run the sales process, and if so, their specific powers.

36.     Furthermore, the Proposed Transaction fails to contain a collar mechanism to ensure the merger consideration remains in a realm of reasonableness in the event of a dramatic change in PotlatchDeltic's stock price prior to the consummation of the Proposed Transaction.

37.     Moreover, the Registration Statement is silent as to the nature of any existing confidentiality agreement entered into between the Company and PotlatchDeltic and whether this agreement differed from any other agreement with potentially interested third parties discussed and/or not specifically mentioned by the Registration Statement, if so in all specific manners, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away.

38.     It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

*The Proposed Transaction*

39.     On May 31, 2022, CatchMark and PotlatchDeltic issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

**SPOKANE, Wash., ATLANTA, Ga. May 31, 2022 (BUSINESS WIRE)** – PotlatchDeltic Corporation (Nasdaq: PCH) ("PotlatchDeltic") and CatchMark Timber Trust, Inc. (NYSE: CTT) ("CatchMark") today announced that they have entered into a definitive agreement to combine in an all-stock transaction. The acquisition by PotlatchDeltic will strengthen and diversify a leading integrated timber REIT and continue to enhance shareholder value.

Based on the closing stock prices of PotlatchDeltic and CatchMark on May 27, 2022, the combined company is expected to have a pro forma market capitalization over $4 billion and total enterprise value of more than $5 billion, including $557 million in net debt.

Under the terms of the agreement, which has been unanimously approved by the Board of Directors of both companies, CatchMark stockholders will receive 0.23 common shares of PotlatchDeltic stock for each common share of CatchMark that they own. This reflects a price per share of $12.88 for each common share of CatchMark, and a 55% premium to CatchMark's common share price as of the close of business on May 27, 2022. Following close of the transaction, PotlatchDeltic stockholders will own approximately 86% of the combined company, and CatchMark stockholders will own approximately 14% on a fully diluted basis.

The combination brings together two high quality timberland REITs resulting in PotlatchDeltic owning approximately 2.2 million acres of diversified timberlands including 626,000 acres in Idaho and over 1.5 million acres in strengthening markets in the U.S. South. PotlatchDeltic also remains the timber REIT with the most leverage to lumber prices, including 1.1 billion board feet of lumber capacity. The transaction also combines two successful and complementary real estate businesses.

Eric J. Cremers, President and Chief Executive Officer of PotlatchDeltic, said, "We are excited about growing shareholder value by combining PotlatchDeltic and CatchMark. With CatchMark, we gain significant scale in three states and diversify our timberland holdings into some of the strongest markets in the U.S. South. In addition, the location of CatchMark's land near large population centers provides attractive rural real estate sales opportunities. PotlatchDeltic will retain a strong balance sheet and liquidity after the merger is completed, providing a platform for continued growth. We also remain committed to responsible environmental, social, and governance strategies."

Brian M. Davis, President and Chief Executive Officer of CatchMark, said, "This partnership with PotlatchDeltic unlocks value for our stockholders and positions us well for sustainable success over the long term. By joining together our high quality assets and our dedicated and talented employees, we will greatly enhance the potential of PotlatchDeltic. We look forward to working together as we integrate

our two companies and capitalize on the robust opportunities for growth and success."

**PotlatchDeltic and CatchMark: Leveraging Two Great Timber REITs**

The combination offers significant strategic and financial opportunities beyond what could be achieved by either company on a standalone basis, notably through:

- **Complementary Timberland Portfolios.** The combination will result in geographic diversity and scale, increasing PotlatchDeltic's U.S. South ownership to over 1.5 million acres of timberland in six states. The transaction adds approximately 350,000 acres of superior site index timberlands in Alabama, South Carolina, and Georgia. CatchMark's timberlands are in some of the strongest markets in the U.S. South with a deep base of well capitalized customers. PotlatchDeltic and CatchMark share a dedication to continue managing timberlands sustainably using best management practices and third-party certification.
- **HBU Real Estate Opportunities.** The combination will result in a diverse real estate portfolio with CatchMark's timberlands located close to large population centers. PotlatchDeltic will leverage its rural land sales expertise and strategy, along with CatchMark's local market knowledge, to maximize rural real estate sales opportunities. These opportunities include potential conservation and solar transactions.
- **Compelling Synergies and Accretive to CAD.** Cash Available for Distribution ("CAD") annual synergies are estimated to be $16 million, reflecting reduced overhead and the elimination of public company expenses, insourcing timberland management and reducing interest expense by refinancing CatchMark's debt. PotlatchDeltic expects the run rate synergies to be achieved by the end of the first full year after the merger closes. PotlatchDeltic expects the transaction will be accretive to Cash Available for Distribution ("CAD") per share in the first full year, excluding costs to achieve synergies and assuming the full synergies run rate.
- **Meaningful Increase in Stable Cash Flows.** EBITDDA contributed by CatchMark is expected to average $55 million annually over the first five years, assuming full synergies run rate.
- **Growing Shareholder Value Through Balanced Capital Allocation.** A strong balance sheet, with pro forma combined Debt to Enterprise Value of approximately 10% will enable PotlatchDeltic to remain flexible and take advantage of other capital allocation opportunities. The addition of CatchMark's cash flows and CAD synergies provide strong coverage for PotlatchDeltic's attractive and growing dividend.

**Board Composition and Headquarters**

The Board of Directors of the combined company will consist of nine Directors from PotlatchDeltic and one Director from CatchMark. The corporate headquarters

will be maintained in Spokane, Washington. A regional office will be maintained in Atlanta, Georgia.

**Timing and Approvals**

The transaction is expected to close in the second half of 2022. The transaction requires approval of stockholders of CatchMark and is subject to the satisfaction of customary closing conditions and regulatory approvals. Due to the transaction, CatchMark has postponed the 2022 annual meeting of its stockholders that had been scheduled for June 14, 2022.

*The Inadequate Merger Consideration*

40.     Significantly, the Company's financial prospects, opportunities for future growth, and investment in innovation establish the inadequacy of the merger consideration.

41.     First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.

42.     Moreover, post-closure, Plaintiff's interest in the future prospects of the Company will be significantly diluted through the Proposed Transaction.

43.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for PotlatchDeltic at the expense of CatchMark stockholders, including specifically Plaintiff, which clearly indicates that Plaintiff in his capacity as a CatchMark stockholder was not an overriding concern in the formation of the Proposed Transaction.

*Preclusive Deal Mechanisms*

44.     The Merger Agreement contains certain provisions that unduly benefit PotlatchDeltic by making an alternative transaction either prohibitively expensive or otherwise impossible.  Significantly, the Merger Agreement contains a termination fee provision that constrains Catchmark's ability to enter into alternative strategic transactions.  Notably, in the event of termination, the merger agreement requires Catchmark to pay up to approximately $19,384,231

to PotlatchDeltic, if the Merger Agreement is terminated under certain circumstances. The termination fee will make the Company that much more expensive to acquire for potential purchasers. The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

45. The Merger Agreement also contains a "No Solicitation" provision that, after a brief period of time post-entry into the Merger Agreement, restricts Catchmark from considering alternative acquisition proposals by, *inter alia*, constraining Catchmark's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide acquisition proposal if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

46. Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, the Individual Defendants agreed to provide PotlatchDeltic information in order to match any other offer, thus providing PotlatchDeltic access to the unsolicited bidder's financial information and giving PotlatchDeltic the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of PotlatchDeltic.

47. These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests Plaintiff in his capacity as a public Company stockholder.

48.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

***Potential Conflicts of Interest***

49.     The breakdown of the benefits of the deal indicate that Catchmark insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Catchmark.

50.     Company insiders, currently own large, illiquid portions of Company stock all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company.  Notably, the Registration Statement fails to provide an accounting of the merger consideration which such shares will be exchanged for as follows:

| Beneficial Owner | Number of Shares Beneficially Owned | Percent of Class |
|---|---|---|
| **5% Stockholders:** | | |
| Ranger Global Real Estate Advisors, LLC | 4,673,598 | 9.48% |
| BlackRock, Inc. | 4,043,483 | 8.20% |
| William Blair Investment Management, LLC | 2,665,047 | 5.41% |
| Renaissance Technologies LLC | 2,590,667 | 5.26% |
| Asset Management Exchange Master ICAV | 2,508,040 | 5.09% |
| The Vanguard Group | 2,482,473 | 5.04% |
| **Directors and Named Executive Officers:** | | |
| Brian M. Davis | 264,049 | * |
| Ursula Godoy-Arbelaez | 105,881 | * |
| Todd P. Reitz | 112,216 | * |
| Lesley H. Solomon | 92,367 | * |
| Tim E. Bentsen | 8,721 | * |
| James M. DeCosmo | 14,874 | * |
| Paul S. Fisher | 34,549 | * |
| Mary E. McBride | 11,978 | * |
| Douglas D. Rubenstein | 50,037 | * |
| All directors and executive officers as a group (9 persons) | 694,672 | 1.41% |

51.     Additionally, Company insiders, currently own large amounts of company options, restricted stock units, and other equity awards, all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company.   Notably, the Registration Statement fails to account for these units.

52.     Moreover, certain employment agreements with certain Catchmark executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.   These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by Plaintiff and will be paid out as follows:

| Name | Cash[1] $ | Equity[2] $ | Perquisites/ Benefits[3] $ | Tax Reimbursement[4] $ | Other $ | Total $ |
|---|---|---|---|---|---|---|
| Brian Davis | 3,182,702 | 5,870,211 | 52,294 | 3,739,639 | N/A | 12,844,846 |
| Ursula Godoy-Arbelaez | 897,000 | 2,300,730 | 10,598 | 1,254,417 | N/A | 4,462,745 |
| Todd Reitz | 1,133,406 | 3,242,127 | — | 1,919,564 | | 6,295,097 |
| Lesley Solomon | 841,554 | 2,854,419 | 19,399 | 1,710,439 | N/A | 5,425,811 |

53.     The Registration Statement also fails to adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

54.     Thus, while the Proposed Transaction is not in the best interests of Catchmark, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers

and directors.

***The Materially Misleading and/or Incomplete Registration Statement***

55.     On July 8, 2022, the Catchmark Board and PotlatchDeltic caused to be filed with the SEC the materially misleading and incomplete Registration Statement that, in violation of the Individual Defendant's fiduciary duties and the Exchange Act, failed to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

56.     Specifically, the Registration Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Registration Statement fails to disclose:

a.  Specific information as to why the inclusion of a collar mechanism in the Proposed Transaction was not required by the Board;

b.  Specific information regarding whether a committee of the Board was created to run the sales process composed of independent and disinterested Directors, and if so, the specific powers of that committee;

c.  Whether the confidentiality agreements entered into by the Company with PotlatchDeltic differed from any other unnamed confidentiality agreement entered into between the Company and potentially interested third parties (if any), and if so, in all specific manners;

d.  All specific conditions under which any standstill provision contained in any

entered confidentiality agreement entered into between the Company and potentially interested third parties throughout the sales process, including PotlatchDeltic, would fall away; and

e.   Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.

*Omissions and/or Material Misrepresentations Concerning Catchmark and PotlatchDeltic' Financial Projections*

57.   The Registration Statement fails to provide material information concerning financial projections for Catchmark and PotlatchDeltic provided by Catchmark and PotlatchDeltic management to the Board, Stifel, and relied upon by Stifel in its analyses.  The Registration Statement discloses management-prepared financial projections for the Company and PotlatchDeltic which are materially misleading.

58.   The Registration Statement should have, but fails to provide, certain information in the projections that Catchmark and PotlatchDeltic management provided to the Board and Stifel. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007)

59.   With regard to the *Certain PotlatchDeltic Unaudited Prospective Financial Information* prepared by Catchmark Management, the Registration Statement fails to disclose

material line items for the following metrics:

    a. Net Income, including all underlying necessary metrics, adjustments, and assumptions used to calculate this metric;

    b. Average lumber price, including all underlying necessary metrics, adjustments, and assumptions used to determine a change in lumber price over time for years 2022E-2026;

    c. EBITDDA, including all underlying necessary metrics, adjustments, and assumptions, including specifically: net income, interest expense, income taxes, basis of real estate sold, depreciation, depletion and amortization;

    d. Cash Available for Distribution, including all underlying necessary metrics, adjustments, and assumptions, including specifically: cash generated that is available for dividends to holders of shares of PotlatchDeltic common stock, repurchases of PotlatchDeltic's common stock, debt repayment, acquisitions and other discretionary and nondiscretionary activities, cash from operating activities, capital spending for purchases of property, plant and equipment, timberlands reforestation, and roads and timberlands acquisitions not classified as strategic.

60.    With regard to the *Certain Catchmark Unaudited Prospective Financial Information* prepared by Catchmark Management, the Registration Statement fails to disclose material line items for the following metrics:

    a. Harvest EBITDA, including all underlying necessary metrics, adjustments, and assumptions, including specifically: timber sales and other revenues, revenues from environmental inititatives, contract logging and hauling expenses, forestry

management expenses, land rent expense, other operating expenses, stock compensation expense ,and certain other cash and non-cash expenses;

b. Real Estate EBITDA, including all underlying necessary metrics, adjustments, and assumptions, including specifically: timberland sales revenue, cost of timberland sales, basis of timberland sold, and sales of higher-and-better use land;

c. Adjusted EBITDA, including all underlying necessary metrics, adjustments, and assumptions, including specifically: interest, taxes, depreciation and amortization; and any other input used to compute this metric; and

d. Cash Available for Distribution, including all underlying necessary metrics, adjustments, and assumptions, including specifically: cash provided by operating activities, capital expenditures, timberland acquisitions, working capital changes, cash distributions from unconsolidated joint ventures, certain cash expenditures that CatchMark management believes do not directly reflect the core business operations of its timberland portfolio on an on-going basis, as well as costs required to be expensed by GAAP related to acquisitions, transactions, joint ventures or new business activities.

61.    The Registration Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

62.    This information is necessary to provide Plaintiff in his capacity as a Company stockholder a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

63.     Without accurate projection data presented in the Registration Statement, Plaintiff is unable to properly evaluate the Company's true worth, the adequacy of merger consideration, PotlatchDeltic's true worth, the accuracy of Stifel's financial analyses, or make an informed decision whether to vote in favor of the Proposed Transaction.  As such, the Board has violated the Exchange Act by failing to include such information in the Registration Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses of Catchmark by Stifel*

64.     In the Registration Statement, Stifel describes its fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

65.     With respect to the *Dividend Discount Analysis* section, the Registration Statement fails to disclose:

    a.     With regard to the *Upside* Scenario:

        i.     The inputs, metrics, and assumptions used to determine an increase in timberland value of 3% per year;

        ii.     The inputs, metrics, and assumptions used to determine priced capital raises at a 10% premium to net asset value; and

        iii.     The inputs, metrics, and assumptions used to determine Catchmark's ability to purchase properties at a 5% discount to NAV.

    b.     With regard to the *Neutral* Scenario:

        i.    The inputs, metrics, and assumptions used to determine an increase in timberland value of 2% per year;

       ii.    The inputs, metrics, and assumptions used to determine priced capital raises at net asset value; and

      iii.    The inputs, metrics, and assumptions used to determine Catchmark's ability to purchase properties at a 2.5% discount to NAV.

c.    With regard to the *Downside* Scenario:

        i.    The inputs, metrics, and assumptions used to determine an increase in timberland value of 1% per year;

       ii.    The inputs, metrics, and assumptions used to determine priced capital raises at a 5% premium to net asset value; and

      iii.    The inputs, metrics, and assumptions used to determine Catchmark's ability to purchase properties at NAV.

d.    The specific bases and adjustments upon which the assumptions underlying the alternative cases rely.

e.    The exact aggregate amount of dividends per share of CatchMark common stock that CatchMark is forecasted to generate on a quarterly basis for the period from April 1, 2022 through December 31, 2026;

f.    The terminal value calculated for Catchmark common stock at the end of year 2026 for each case;

g.    The inputs, metrics, and assumptions used to determine discount rate range of 9.14% to 12.16%; and

h.    Catchmark's assumed cost of equity.

66.    With respect to the *Selected Comparable Company Analysis* for Catchmark, the Registration Statement fails to disclose:

    a.  The Enterprise Values for the Companies utilized, as well as all underlying inputs and assumptions used to calculate this metric, including specifically: value attributed to the ancillary wood product businesses and real estate sales timber sales, and removal and depletion expense;

    b.  The underlying inputs and assumptions used to calculate Adjusted Timberland EV / CY2022E Timberland EBITDA of 27.3x to 35.0x;

    c.  The underlying inputs, metrics, and assumptions used to treat 50% of EBITDA as cash;

    d.  The number of fully diluted outstanding shares of the Company;

    e.  The cash and debt balances for the Company

67.    With respect to the *Gross Timberlands Analysis* section, the Registration Statement fails to disclose:

    a.  The inputs, metrics, and assumptions used to determine discount rate ranging from 5.0% to 6.5%;

    b.  The Company's weighted average cost of capital;

    c.  The inputs, metrics, and assumptions used to determine a perpetuity growth rate range of 0.5% to 1.5%;

    d.  The inputs and assumptions used to determine adjustments to timber pricing of (5.00%) to 5.00%;

    e.  The Company's net debt;

    f.  The value of unlevered free cash flow for the Company;

g.  The terminal value calculated for the Company; and

h.  The implied equity value for the Company.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses of PotlatchDeltic by Stifel*

68.  With respect to the *Discounted Cash Flow Analysis* for PotlatchDeltic, the Registration Statement fails to disclose:

a.  The specific value of unlevered free cash flows for PotlachDeltic;

b.  The inputs, metrics, and assumptions used to determine a discount rate ranging from 7.64% to 9.64%;

c.  PotlachDeltic's weighted average cost of capital;

d.  The terminal values calculated for PotlatchDeltic;

e.  The inputs, metrics, and assumptions used to determine exit multiple ranges with midpoints of 4.5x, 25.0x and 0.5x;

f.  The inputs, metrics, and assumptions used to determine perpetuity growth rates of 2.0% to 3.0%; and

g.  PotlachDeltic's net debt;

h.  The implied equity value calculated; and

i.  The number of fully diluted outstanding shares of Potlachdeltic.

69.  With respect to the *Comparable Companies Analysis* for PotlatchDeltic, the Registration Statement fails to disclose:

a.  The multiples, inputs, metrics and assumptions for each company compared;

b.  The underlying inputs and assumptions used to calculate a representative range of Adjusted Wood Products EV / CY2022E Wood Products EBITDA of 1.7x

to 2.3x;

    c.   The underlying inputs and assumptions used to calculate a representative range of Adjusted Timberland EV / CY2022E Timberland EBITDA of 27.3x to 35.0x

70.    These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

71.    Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a stockholder.  Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public Catchmark stockholder.  As such, the Board has violated the Exchange Act by failing to include such information in the Registration Statement.

## FIRST COUNT

### Breach of Fiduciary Duties

### <u>(Against the Individual Defendants)</u>

72.    Plaintiff repeats all previous allegations as if set forth in full herein.

73.    The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff in his capacity as a Company public stockholder.

74.    By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff of the true value of his investment in CatchMark.

75.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the Plaintiff

in his capacity as a Company public stockholder by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of the Company to Plaintiff in his capacity as a Company public stockholder.

76.     Indeed, Defendants have accepted an offer to sell CatchMark at a price that fails to reflect the true value of the Company, thus depriving Plaintiff in his capacity as a Company public stockholder of the reasonable, fair and adequate value of his shares.

77.     Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff in his capacity as a Company public stockholder all material information necessary for it to make an informed decision on whether to vote his shares in favor of the Proposed Transaction.

78.     The Individual Defendants dominate and control the business and corporate affairs of CatchMark, and are in possession of private corporate information concerning CatchMark's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and Plaintiff in his capacity as a Company public stockholder which makes it inherently unfair for them to benefit their own interests to the exclusion of Plaintiff.

79.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff in his capacity as a Company public stockholder.

80.     As a result of the actions of the Individual Defendants, Plaintiff in his capacity as a Company public stockholder will suffer irreparable injury in that he has not and will not receive its fair portion of the value of CatchMark's assets and has been and will be prevented from obtaining a fair price for his holdings of CatchMark common stock.

81.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff in his capacity as a Company public stockholder, all to the irreparable harm of the Plaintiff.

82.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

## Aiding and Abetting the Board's Breaches of Fiduciary Duty

## (Against Defendant CatchMark)

83.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

84.     Defendants CatchMark, knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.

85.     As a result this conduct, Plaintiff in his capacity as a Company public stockholder will suffer irreparable injury in that he has not and will not receive his fair portion of the value of CatchMark's assets and has been and will be prevented from obtaining a fair price for its holdings of CatchMark common stock.

86.     Plaintiff has no adequate remedy at law

## THIRD COUNT

## Violations of Section 14(a) of the Exchange Act

## (Against All Defendants)

87.     Plaintiff repeats all previous allegations as if set forth in full herein.

88.     Defendants have disseminated the Preliminary Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

89.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

90.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

91.     The Preliminary Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have

known that the Preliminary Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

92.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

93.     The Individual Defendants were at least negligent in filing a Preliminary Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Preliminary Proxy Statement not misleading.

94.     The misrepresentations and omissions in the Preliminary Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to vote his shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

**FOURTH COUNT**

**Violations of Section 20(a) of the Exchange Act**

**<u>(Against all Individual Defendants)</u>**

95.     Plaintiff repeats all previous allegations as if set forth in full herein.

96.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

97.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy Statement.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Preliminary Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

98.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of CatchMark's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Preliminary Proxy Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

99.     The Individual Defendants acted as controlling persons of CatchMark within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause CatchMark to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled CatchMark and all of its employees.  As alleged above, CatchMark is a primary violator of Section 14 of the Exchange Act

and SEC Rule 14a-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

A.      Enjoining the Proposed Transaction;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.      Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

D.      Directing the Individual Defendants to comply with the Exchange Act to disseminate a Preliminary Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E.      Directing defendants to account to Plaintiff for damages sustained because of the wrongs complained of herein;

F.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: August 2, 2022                    **BRODSKY & SMITH**

                                         By:  */s/ Evan J. Smith*
                                         _____
                                              Evan J. Smith
                                              240 Mineola Boulevard

Mineola, NY  11501
Phone:  (516) 741-4977
Facsimile (561) 741-0626

*Counsel for Plaintiff*